[Cite as *Sacksteder v. Senney*, 2012-Ohio-4452.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

PAUL L. SACKSTEDER, et al.                 :

    Plaintiffs-Appellants                 :                 C.A. CASE NO.    24993

v.                                                       :                 T.C. NO.    10CV1913

JEFFREY S. SENNEY, et al.                 :                 (Civil appeal from
                                     Common Pleas Court)

    Defendants-Appellees                 :

                                          :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____28th____ day of ____September____, 2012.

. . . . . . . . . .

JOHN J. MUELLER, Atty. Reg. No. 0012101, 632 Vine Street, Suite 800, Cincinnati, Ohio 45202
    Attorney for Plaintiffs-Appellants, Paul L. Sacksteder and Circle Business Services, Inc., dba EXTRAhelp Staffing Services

NEIL F. FREUND, Atty. Reg. No. 0012183 and LINDSAY M. JOHNSON, Atty. Reg. No. 0077753, Fifth Third Center, 1 South Main Street, Suite 1800, Dayton, Ohio 45402
    Attorneys for Defendants-Appellees, Jeffrey S. Senney, Paul E. Zimmer, Andrew C. Storar, Gerald L. McDonald and Pickrel, Schaeffer & Ebeling Co., LPA

JOHN F. HAVILAND, Atty. Reg. No. 0029599 and CARLA J. MORMAN, Atty. Reg. No. 0067062, 400 PNC Center, 6 North Main Street, Dayton, Ohio 45402
    Attorneys for Defendants-Appellees, Barry Staff, Inc., Douglas J. Barry, Jr., Teresa Ambos and Nicole Brumbaugh

QUINTON F. LINDSMITH, Atty. Reg. No. 0018327 and VICTORIA A. FLINN, Atty. Reg. No. 0085713, 100 South Third Street, Columbus, Ohio 43215
Attorneys for Defendant-Appellee, Jerome M. Buening, Jr.

. . . . . . . . . .

FROELICH, J.

{¶ 1} Paul Sacksteder and Circle Business Services, Inc., dba EXTRAhelp Staffing Services, appeal from a judgment of the Montgomery County Court of Common Pleas, which dismissed their complaint pursuant to Civ. R. 12(B)(6) for failure to state a claim.

{¶ 2} For the reasons discussed below, the judgment of the trial court will be reversed in part and affirmed in part.

I.   Facts and Procedural History

{¶ 3} In March 2010, Sacksteder and EXTRAhelp filed a complaint against the law firm Pickerel, Schaeffer and Ebeling, Co., LPA, and several of its attorney employees, Jeffery Senney, Paul Zimmer, Andrew Storar, and Gerald McDonald, alleging legal malpractice and breach of fiduciary duty.  The lawsuit also alleged tortious interference with business relationships, and conversion and misappropriation of trade secrets and confidential information on the part of three former employees of EXTRAhelp, Jerome Buening II, Teresa Ambos, and Nicole Brumbaugh.  Finally, the complaint alleged participation in breach of fiduciary duty and interference with business relationships by Douglas Barry, Jr., and BarryStaff, Inc.

{¶ 4} The claims in this case arise from the failed sale of EXTRAhelp to BarryStaff in 2009.  During negotiations, lawyers from Pickerel, Schaeffer and Ebeling ("PS&E") represented both sides of the transaction.

{¶ 5}   Paul Sacksteder is the president of EXTRAhelp.  At various times before the attempted sale, PS&E lawyers had provided services to Sacksteder and EXTRAhelp on an "as needed, when-needed" basis. After encountering some business difficulties, EXTRAhelp decided in August 2008, to sell its business or liquidate.  A business broker located three potential buyers and Belcan Services Group, LP, also indicated interest in purchasing the business.  Talks with Belcan and other potential buyers continued into January and February 2009.

{¶ 6}   In mid-February 2009, attorney Jeffrey Senney sent a letter to EXTRAhelp on behalf of BarryStaff, indicating that Senney represented a party interested in purchasing the business.   Senney said that his client would be happy to sign a mutual non-disclosure agreement.  After receiving the letter, Sacksteder contacted Andrew Storar, who was a member of the same law firm as Senney.   Storar told Sacksteder that a conflict of interest existed, but said the conflict could be waived.   According to the complaint, Storar failed to explain the risks involved with conflicting representation.

{¶ 7}   After speaking with Storar, Sacksteder gave Senney his cell phone number. Sacksteder then met with Douglas Barry of BarryStaff to discuss a merger.   Barry and Sacksteder agreed to let PS&E represent both sides of the transaction.   Sacksteder informed Storar of the discussions and was told that Paul Zimmer, another PS&E employee, would be representing Sacksteder for purposes of the sale.   Again, according to the complaint, neither Zimmer nor Storar informed Sacksteder of the risks of disclosing confidential information without a non-disclosure agreement, and neither took steps to obtain such an agreement from Barry.

{¶ 8}   During subsequent discussions with Barry, Sacksteder disclosed some

confidential and proprietary business information about EXTRAhelp. During these discussions, Sacksteder also told Barry that he was contemplating a sale to Belcan. Barry then offered to purchase the business on terms similar to those that Belcan had offered. Sacksteder decided to proceed with the sale to Barry, but Barry later withdrew from the proposed sale, based on advice from Senney, who had discovered potential problems with the transaction. Sacksteder then informed Barry that he would pursue the sale to Belcan.

{¶ 9} In mid-March 2009, Sacksteder and Belcan entered into negotiations. Around the same time, Sacksteder learned that EXTRAhelp's own employee or former employee, Jerome Buening, had approached a customer of EXTRAhelp. Buening told the customer that EXTRAhelp was selling its business to Belcan and was broke. Buening then solicited the customer's business and asked the customer to terminate its relationship with EXTRAhelp. Sacksteder also learned that Buening had revealed EXTRAhelp's confidential and proprietary information and trade secrets to Barry.

{¶ 10} The sale between EXTRAhelp and Belcan closed "on or about" March 24, 2009, by a transfer of EXTRAhelp's business and assets to Belcan via a document entitled "Asset Purchase Agreement." Under the terms of the transaction, EXTRAhelp sold and transferred all its trade secrets and confidential and proprietary information, including customer lists, temporary employee assignments, customer contact information, and customer purchasing history, to Belcan. Although certain facts were not mentioned in the complaint or amended complaint, they were discussed by all parties in memoranda connected to the various motions to dismiss, and were also explicitly considered by the trial court in ruling on the motion to dismiss. Specifically, EXTRAhelp alleged that according to the terms of the sale, EXTRAhelp could

receive additional payments based on the purchaser's receipts from former customers of EXTRAhelp which continued to do business with the purchaser, Belcan.

{¶ 11}    EXTRAhelp's employees were informed of the sale "on or about" March 25, 2009.  The following day, Belcan offered employment to some employees, including Teresa Ambos and Nicole Brumbaugh.  Neither Ambos nor Brumbaugh accepted employment.  On March 30, 2009, Sacksteder found notes that both employees had left at their workstations, indicating that they had accepted employment with BarryStaff.  On the same day, Barry told Sacksteder that he had entered into discussions with EXTRAhelp's largest client, and that as a result of those discussions, the client was taking its business from EXTRAhelp and was placing it with BarryStaff.

{¶ 12}    Sacksteder and EXTRAhelp filed suit in March 2010, alleging, as indicated, that the law firm defendants, the potential purchaser (BarryStaff), and the former employees had committed various acts of negligence, breaches of fiduciary duty, dissemination of confidential information, and tortious interference with business relationships.  The case was transferred to a visiting judge, and was also consolidated in April 2009, with a prior case that Belcan had filed against BarryStaff, Ambos, and Brumbaugh.

{¶ 13}    After the defendants all filed motions to dismiss pursuant to Civ. R. 12(B)(6), Sacksteder and EXTRAhelp filed an amended complaint.  The defendants again filed motions to dismiss under Civ. R. 12(B)(6).  Subsequently, the trial court dismissed the complaint, relying on what the court termed the "plausible test" of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  Sacksteder and EXTRAhelp appeal from the judgment of dismissal.

II. Alleged Error in Applying a Plausibility Test to Motions to Dismiss

{¶ 14}   Sacksteder's and EXTRAhelp's first assignment of error is as follows:

**In ruling on motions to dismiss, the trial court applied the standards of pleading the Supreme Court of the United States adopted in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 173 L.Ed.2d 868 (2009), to govern pleadings under Fed.R.Civ.P. 8.   Applying those federal pleading standards to a pleading governed by Civ. R. 8, which requires only a short, plain statement providing notice of the claim, the trial court erred.**

{¶ 15}   Sacksteder and EXTRAhelp contend that the trial court improperly substituted a federal "plausibility standard" for the notice pleading that has long been applied in Ohio cases. We consider orders granting Civ. R. 12(B)(6) motions to dismiss under a de novo standard of review.  *Perrysburg Twp. v. Rossford*, 103 Ohio St.3d 79, 2004-Ohio-4362, 814 N.E.2d 44, ¶ 15.   Further, in conducting this review, courts traditionally "accept as true all factual allegations in the complaint."   Id., citing *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988).

{¶ 16}   The plausibility standard originates from two cases decided by the United States Supreme Court.   The first case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), involved claims brought under the Sherman Act, 15 U.S.C. 1, for restraint of trade.    The action in *Bell* was brought by subscribers of local telephone and/or high speed internet services against companies which had enjoyed monopolies after the 1984 divestiture of the AT&T local telephone business.   Id. at 548.   The subscribers alleged that the

companies had conspired to restrain trade by engaging in "parallel conduct" in their respective services areas to inhibit growth of other companies, and by agreeing to refrain from competing with each other. Id. at 550-551. After the district court dismissed the complaint for failure to state a claim, the Court of Appeals for the Second Circuit reversed. Id. at 552-553. The United States Supreme Court then granted certiorari to consider the proper standard for pleading antitrust conspiracies through "allegations of parallel conduct." Id. at 553.

{¶ 17} In considering this issue, the Supreme Court first stressed that in the antitrust context, "[e]ven 'conscious parallelism,' a common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.' " Id. at 553-554, quoting from *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). The Court noted that it had previously guarded against false inferences at both the directed verdict and summary judgment stages of trial, based on the ambiguity of "parallel conduct," which can just as easily be consistent with a range of legitimate business strategies. 550 U.S. at 554. However, the Court concluded that the case at hand presented an opportunity to address the "antecedent" issue of what plaintiffs must plead in order to state a claim under Section 1 of the Sherman Antitrust Act. Id.

{¶ 18} To resolve this issue, the Court first considered general standards of pleading. The court noted that detailed factual allegations are not required, but Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Due to the nature of Section 1 claims, the Court determined that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be

placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." Id. at 557. The Court, therefore, required some "further factual enhancement" that would allow the complaint to cross the line between "possibility and plausibility of 'entitle[ment[ to relief.' " Id.

{¶ 19} The majority in *Twombly* was clearly concerned by the fact that "proceeding to antritrust discovery can be quite expensive," as exemplified by the case at hand, which involved a putative class of at least 90 percent of subscribers to local telephone or internet service in the United States, and antitrust violations that had allegedly occurred over a seven year period. 550 U.S. at 558. The majority dismissed the effect of trial court supervision in checking discovery abuse, and concluded that requiring allegations to "reach the level suggesting conspiracy" was the only way to avoid potentially enormous discovery expense in cases where there was no " ' "reasonably founded hope" ' " that evidence to support a claim would be discovered. (Citations omitted.) Id. at 559.

{¶ 20} After making these observations, the Supreme Court noted that the plaintiffs' main objection to a "plausibilty" standard was its conflict with the accepted rule from *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that " 'a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " 550 U.S. at 561, quoting from *Conley*, 355 U.S. at 45-46. The Court cautioned that the "no set of facts" language in *Conley* should not be read in isolation to mean that "any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings." Id. Instead, this phrase ("no set of facts") should be viewed through the prism of the *Conley*

opinion's directly-preceding summary of the complaint's allegations, which had amply stated a claim for relief.   Id. at 563.

{¶ 21}   Nonetheless, because of what the Supreme Court characterized as the legal profession's "puzzlement" over *Conley* for 50 years, the Court stated that the "no set of facts" phrase should be "best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."   Id.

{¶ 22}   Finally, the Court looked for "plausibility" in the complaint and found it lacking.   Among other things, the Court relied on the idea of viewing the complaint "in light of common economic experience."   550 U.S. at 565.   The Court also focused on what it termed an "obvious alternative explanation" for the parallel conduct.   Id. at 567.   In this regard, the Court noted history's teaching that in "a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement." Id.   However, the court rejected this explanation for the defendant's alleged conduct, observing instead that:

> In the decade preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception.   * * * The ILECs [the alleged conspirators] were born in that world, doubtless liked the world the way it was, and surely knew the adage about him [sic] who lives by the sword.   Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing. (Citation omitted.)   Id. at 567-568.

{¶ 23} Thus, the Court credited the alternate explanation, concluded the complaint had been properly dismissed, and reversed the decision of the Seventh Circuit Court of Appeals.

{¶ 24} The Supreme Court's decision in *Twombly* could be viewed in the context of its circumstances, which included a particular industry, an unavoidably enormously expensive lawsuit, and a legal context that requires particularity of proof. However, its later decision in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), continued the discussion about pleading.

{¶ 25} In *Iqbal*, an alleged terrorist claimed that he had been deprived of constitutional protections while in federal custody, and filed suit against several federal officials, including Attorney General John Ashcroft. Id. at 666. The complaint alleged that Ashcroft and the Director of the FBI had adopted an unconstitutional policy subjecting Iqbal to harsh conditions of confinement, based on his race, religion, or national origin. Id.

{¶ 26} The district court denied the defendants' motion to dismiss the complaint, applying the standard test outlined in *Conley*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On appeal, the Second Circuit Court of Appeals acknowledged that *Twombly* had retired *Conley's* "no-set-of-facts" test. After discussing how to apply *Twombly*, the Second Circuit concluded that it required a " 'flexible "plausibility standard," which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.' " *Iqbal*, 556 U.S. at 670, quoting from *Iqbal v. Hasty*, 490 F.3d 143, 157–158 (C.A.2 2007). Because the case did not involve such a context, the Second Circuit Court of Appeals upheld the pleading as adequate. Id.

{¶ 27} On appeal, the Supreme Court first considered subject matter jurisdiction, which

is not relevant to our discussion. The court then considered one element necessary to prove the defendants' liability, which was that the defendants had adopted and implemented the detention policies "not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national origin." 556 U.S. at 677. This required a showing of purpose, rather than knowledge. Id. Before deciding if the complaint met this standard, the Court considered and attempted to expound upon its prior decision in *Twombly*.

{¶ 28} Initially, the Court acknowledged that Fed.Civ.R. 8(a)(2) requires only a " 'short and plain statement of the claim showing that the pleader is entitled to relief.' " Id. The Court noted that under *Twombly*:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. * * * Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " (Citations omitted.) Id. at 678.

{¶ 29} The Court then discussed what it classified as the "two working principles" underlying *Twombly*:

> First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice. (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" * * *). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." (Citations omitted.) 556 U.S. at 678-79.

**{¶ 30}** Finally, the Court discussed the role of trial judges, by stating that:

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Id.

**{¶ 31}** In applying this framework to the pleadings before it, the Court first identified allegations in the complaint that it felt were "not entitled to the assumption of truth." Id. at

680. For example, the Court rejected the allegation that Ashcroft was the principal architect of the invidious policy of discrimination, because the Court considered it "conclusory." Id. More troubling yet is the fact that the Supreme Court weighed the factual allegations to determine if they "plausibly suggest an entitlement to relief." Id. at 681. The Court acknowledged that specific factual allegations that thousands of Arab Muslim men had been arrested and detained as part of the FBI investigation of the September 11 events, and that defendants had approved the policy of holding these men in highly restrictive conditions, were consistent with purposefully designating detainees of "high interest" due to race, religion or national origin. Id. at 681. However, the Court rejected that theory as "plausibly establishing this purpose," because it believed there were "more likely explanations," id., like the fact that a legitimate policy directing law enforcement personnel to arrest and detain individuals because of a suspected link to the terrorist attacks would produce a "disparate, incidental impact on Arab Muslims." Id. at 682.

{¶ 32} As an additional basis for its conclusion, the Supreme Court went on to note that even if the respondent's arrest gave rise to a plausible inference of discrimination, the only factual allegation against Ashcroft and Mueller was that they had adopted a policy approving " 'restrictive conditions of confinement' " for these detainees until they were cleared by the FBI. 556 U.S. at 683. The Court rejected this contention, again on the basis that it is more plausible that the policy would have been adopted for national security reasons as opposed to purposeful discrimination. Id. Accordingly, the Court found that the complaint failed to state a claim, and reversed the matter for a decision on whether the petitioner would be permitted to file an amended complaint. Id. at 687.

{¶ 33} Justice Souter, who had authored the majority opinion in *Twombly*, filed a strong

dissent, in which three members of the Court concurred. Justice Souter noted that Ashcroft and Mueller had conceded in their briefs that they would be liable for their subordinates' conduct "if they 'had actual knowledge of the assertedly discriminatory nature of the classification of suspects as being "of high interest" and they were deliberately indifferent to that discrimination.' " Id. at 694-695. (Souter, dissenting). Souter thus concluded that the complaint satisfied Fed. Civ. R. 8(a)(2). He also commented that the complaint went further than required, by alleging that these defendants had affirmatively acted to create the discriminatory policy. Id. at 695.

**{¶ 34}** Souter further observed that:

Ashcroft and Mueller argue that these allegations fail to satisfy the "plausibility standard" of *Twombly*. They contend that Iqbal's claims are implausible because such high-ranking officials "tend not to be personally involved in the specific actions of lower-level officers down the bureaucratic chain of command." Brief for Petitioners 28. But this response bespeaks a fundamental misunderstanding of the enquiry that *Twombly* demands. *Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be. See *Twombly*, 550 U.S., at 555, 127 S.Ct. 1955 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); id., at 556, 127 S.Ct. 1955 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); see also *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"). The sole

exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. That is not what we have here.

Under *Twombly*, the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible. That is, in *Twombly's* words, a plaintiff must "allege facts" that, taken as true, are "suggestive of illegal conduct." 550 U.S., at 564, n. 8, 127 S.Ct. 1955. *Iqbal*, 556 U.S. at 695-696.

**{¶ 35}** After *Iqbal*, federal courts have struggled over how to interpret and implement *Twombly* and *Iqbal*. See *Dobyns v. U.S.*, 91 Fed.Cl. 412, 424 (Fed.Cl. 2010) (noting that one end of the spectrum views these cases in "minimalist terms," and continues to apply all or nearly all the traditional concepts identified with notice pleading; the other end of the spectrum views them as having established "a fundamentally-different, significantly-heightened pleading standard." ) See, also, *Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir. 2012).

**{¶ 36}** In *Khalik*, the Tenth Circuit Court of Appeals adopted a "middle ground" that it described as a "refined standard" – meaning that "[i]n other words, Rule 8(a)(2) still lives." Id. at 1191-1192. The Tenth Circuit Court of Appeals noted in *Khalik* that:

In applying this new, refined standard, we have held that plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.' " Further, we have noted that "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context." (Citation omitted.) Id. at 1191.

{¶ 37}    The Supreme Court has not provided further guidance to the lower courts, Instead, the Court has infrequently cited *Twombly* and *Iqbal* in subsequent cases.   Where these cases have been cited in the context of motions to dismiss, the Court has continued to refer to traditional standards for crediting allegations in the complaint.   For example, in *Matrixx Initiatives, Inc. v. Siracusano*, ___ U.S. ___, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011), the Supreme Court held that a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934, was sufficient. In evaluating the complaint, the Court noted that "Respondents' consolidated amended complaint alleges the following facts, which the courts below properly assumed to be true."    Id. at 1314, citing *Iqbal*, 556 U.S. 556, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).   The Court reiterated the same standard later in the opinion, stating that "[a]ssuming the complaint's allegations to be true, as we must, Matrixx [the defendant] received information that plausibly indicated a reliable causal link between Zicam and anosmia."   Id. at 1322.

{¶ 38}    The use of the word "plausibly" indicates that the Court has not completely abandoned its stance, but the reference is more muted than one would expect, given the comments in *Twombly* and *Iqbal*.    In light of this fact and the varying approaches taken by the federal circuit courts, any abandonment of standards that have been routinely applied in Ohio for many years should be a matter for the Ohio Supreme Court.   Notably, we are not bound by decisions of the United States Supreme Court that do not involve federal statutory and constitutional law.   See, *e.g.*, *State v. Burnett*, 93 Ohio St.3d 419, 422, 755 N.E.2d 857 (2001).

{¶ 39}   To support their position that we should apply heightened pleading standards, Appellees cite several cases from other Ohio districts that have allegedly adopted *Twombly* and *Iqbal*.   We have reviewed the relevant authority and do not find that heightened standards have

been adopted.

{¶ 40} For example, the Fifth District Court of Appeals cited *Iqbal* for the proposition that "[a] legal conclusion cannot be accepted as true for purposes of ruling on a motion to dismiss." *Cirotto v. Heartbeats of Licking Cty.*, 5th Dist. Licking No. 10-CA-21, 2010-Ohio-4238, ¶ 18. This is hardly a novel concept. See, *e.g.*, *Bratton v. Adkins*, 9th Dist. Summit No. 18136, 1997 WL 459979, *1 (Aug. 6, 1997)(holding that even under " 'notice' pleading, a complaint must be more than 'bare assertions of legal conclusions' "). In any event, the Fifth District Court of Appeals went on to apply traditional standards in affirming the dismissal of the complaint, by accepting all factual allegations as true and applying all reasonable inferences in favor of the moving party. Id. at ¶ 17.

{¶ 41} In *Vagas v. City of Hudson*, 9th Dist. Summit No. 24713, 2009-Ohio-6794, the Ninth District Court of Appeals cited *Twombly* for the proposition that complaints must contain more than mere "labels and conclusions." The court then applied traditional Civ. R. 12(B)(6) standards. Id. at ¶ 7 and 13. Again, the rule is not new that "[u]nsupported conclusions of a complaint are not considered admitted * * * and are not sufficient to withstand a motion to dismiss." *Prudential Ins. Co. of Am. v. Corporate Circle, Ltd.*, 103 Ohio App.3d 93, 658 N.E.2d 1066 (8th Dist. 1995), citing *State ex rel. Hickman v. Capots*, 45 Ohio St.3d 324, 544 N.E.2d 639 (1989).

{¶ 42} Similarly, the Eleventh District Court of Appeals cited *Twombly* for the idea that mere recitation of the elements of a cause of action is insufficient without some factual allegations. Nonetheless, traditional Civ. R. 12(B)(6) standards were also cited. See *Hoffman v. Fraser*, 11th Dist. Geauga No. 2010–G–2975, 2011-Ohio-2200, ¶ 21.

{¶ 43}    Several cases in the Eighth District Court of Appeals have cited *Twombly* in the context of indicating that the right to relief shown in the complaint must be more than speculative.    See    *Gallo v. Westfield Natl. Ins. Co.*, 8th Dist. Cuyahoga No. 91893, 2009-Ohio-1094, ¶ 9; *Williams v. Ohio Edison*, 8th Dist. Cuyahoga No. 92840, 2009-Ohio-5702, ¶ 15; *Parsons v. Greater Cleveland Regional Transit Auth.*, 8th Dist. Cuyahoga No. 93523, 2010-Ohio-266, ¶ 11; *Fink v. Twentieth Century Homes, Inc.*, 8th Dist. Cuyahoga No. 94519, 2010-Ohio-5486, ¶ 24; and    *DiGiorgio v. Cleveland*, 8th Dist. Cuyahoga No. 95945, 2011-Ohio-5878, ¶ 41.    These courts continue, however, to cite and apply traditional Civ. R. 12(B)(6) standards.    See, *e.g.*, *Fink*, at ¶ 23, and *DiGiorgio*, at ¶19.

{¶ 44}    *Snowville Subdivision Joint Venture Phase I v. Home S. & L. of Youngstown, Ohio*, 8th Dist. Cuyahoga No. 96675, 2012-Ohio-1342, is the most recent decision on this subject from the Eighth District Court of Appeals.    In that case, the Eighth District recited traditional Ohio rules for construing complaints, and then noted that:

> This analysis was shifted by recent Supreme Court decisions addressing the federal notice pleading standard in Fed.Civ.R. 8, upon which Ohio's Civ.R. 8 pleading requirement is based.    See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 149, 173 L.Ed.2d 868 (2009).    The Court held that bald legal conclusions did not constitute a well-pled complaint.    In order to survive a motion to dismiss, the complaint must offer factual support for the legal conclusions drawn within.    *Iqbal* at 1949.    These holdings are similar to the rule enunciated in *Capots*, cited above.    But the shift lies in the level of certainty of the complaint.    Based on the above Ohio case law, plaintiffs must only show

some set of facts that would entitle them to relief. *O'Brien* at 245, 327 N.E.2d 753. *Snowville*, 2012-Ohio-1342 at ¶ 9, referring to *State ex rel. Hickman v. Capots*, 45 Ohio St.3d 324, 544 N.E.2d 639 (1989), and *O'Brien v. University Community Tenants Union, Inc.*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975).

{¶ 45} The interstitial, definitional progression from the "fantastic" (*e.g.*, "little green men") through "speculative," "conceivable," "possible," "plausible," "reasonably founded," "consistent with liability," "suggestive of liability," to "probability," can be the legal equivalent of explaining the progression from a quark to the Higgs boson. Ohio has long recognized that cases should be decided on their merits, not procedural technicalities. *Lykins v. Miami Valley Hosp.*, 157 Ohio App.3d 291, 2004-Ohio-2732, 811 N.E.2d 124 (2d Dist.), ¶ 92 (also noting that "Civ.R. 8(F) requires a court to liberally construe all pleadings 'as to do substantial justice' "). Other courts have not adopted a heightened pleading standard for Civ. R. 12(B)(6) motions to dismiss or considered such a motion to dismiss as a Civ. R. 56 motion for summary-judgment-lite. By the same token, we have never construed Civ.R. 12(B)(6) as permitting either speculation or complaints that are devoid of factual allegations supporting the legal claims.

{¶ 46} Thus, to the extent that the trial court adopted a plausibility test based on *Twombly* and *Iqbal*, it erred, and the first assignment of error is sustained on that basis. However, the error would not be prejudicial, unless the complaint fails on standards that have been traditionally applied by Ohio courts to evaluate motions to dismiss.

{¶ 47} The First Assignment of Error is sustained.

    III. Alleged Error in Applying Traditional Civ. R. 12(B)(6) Standards

{¶ 48} Sacksteder's and EXTRAhelp's second assignment of error is as follows:

**In dismissing all claims against all defendants, the trial court concluded that "the claim rests on its participation in breaches by the law firm and none are set out, nor are damages set out other than as conclusory." The trial court reached these conclusions applied [sic] incorrect pleading standards and a resulting incorrect standard on a motion to dismiss for failure to state a claim for relief. Accordingly, in applying a "plausibility" standard of pleading in determining a motion to dismiss under Civ. R. 12(B)(6), the trial court erred.**

{¶ 49} As was noted, Ohio has adhered to the following standards with respect to Civ.R. 12(B)(6) motions:

In construing a complaint upon a motion to dismiss for failure to state a claim, we must presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party. Then, before we may dismiss the complaint, it must appear beyond doubt that plaintiff can prove no set of facts warranting a recovery. (Citations omitted.) *Mitchell*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988).

{¶ 50} In *York v. Ohio State Highway Patrol*, 60 Ohio St.3d 143, 573 N.E.2d 1063 (1991), the Ohio Supreme Court stressed that under notice pleading rules:

[A] plaintiff is not required to prove his or her case at the pleading stage. Very often, the evidence necessary for a plaintiff to prevail is not obtained until the plaintiff is able to discover materials in the defendant's possession. If the plaintiff were required to prove his or her case in the complaint, many valid claims would be dismissed because of

the plaintiff's lack of access to relevant evidence. Consequently, as long as there is a set of facts, consistent with the plaintiff's complaint, which would allow the plaintiff to recover, the court may not grant a defendant's motion to dismiss. Id. at 145.

{¶ 51} In order to analyze the validity of the trial court's decision, our discussion will separate the claims against the various groups of parties: the law firm defendants; the potential purchaser; and the EXTRAhelp employees.

A. Claims against the Law Firm Defendants

{¶ 52} The amended complaint contains three claims for relief with respect to the law firm defendants, based on legal malpractice, negligent and intentional breach of fiduciary duty, and vicarious liability (the latter being applicable only to the law firm). Our discussion of these claims will be combined, because "[a]n action against one's attorney for damages resulting from the manner in which the attorney represented the client constitutes an action for malpractice within the meaning of R.C. 2305.11, regardless of whether predicated upon contract or tort or whether for indemnification or for direct damages." *Muir v. Hadler Real Estate Management Co.*, 4 Ohio App.3d 89, 90, 446 N.E.2d 820 (10th Dist. 1982). Accord, *Trustees of Ohio Carpenters' Pension Fund v. U.S. Bank Natl. Assn.*, 189 Ohio App.3d 260, 2010-Ohio-911, 938 N.E.2d 61, ¶ 23 (8th Dist.). Further, the law firm is only liable if the attorneys are found to have committed legal malpractice. *Natl. Union Fire Ins. Co. of Pittsburgh, PA v. Wuerth,* 122 Ohio St.3d 594, 594, 2009-Ohio-3601, 913 N.E.2d 939, paragraph two of the syllabus.

> To establish a cause of action for legal malpractice based on negligent representation, a plaintiff must show (1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed

to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss. *Vahila v. Hall,* 77 Ohio St.3d 421, 422, 674 N.E.2d 1164 (1997), syllabus.

{¶ 53} The complaint and amended complaint allege that an attorney-client relationship existed between the law-firm defendants and the plaintiffs. The complaints also alleged breach of the duty in three basic ways: 1) the attorneys failed to properly advise plaintiffs about precautions to take when proceeding with discussions with Barry and BarryStaff; 2) the attorneys failed to advise of risks associated with disclosing confidential information without a properly executed confidentiality agreement; and 3) the attorneys failed to provide such an agreement to be executed by plaintiffs and BarryStaff. In addition, the complaints and memoranda allege that the plaintiff, Sacksteder, disclosed confidential information to Barry during negotiations, and that Barry used information gained during negotiations or from EXTRAhelp's employees to solicit, and thus, basically steal EXTRAhelp's largest client. Finally, the complaints allege that Sacksteder and EXTRAhelp would have enjoyed a better financial position without the improper acts, and that they suffered financial damages as a result of the lawyers' failures.

{¶ 54} In granting the motion to dismiss, the trial court concluded that "It does not appear that plaintiff passed on any particular information that Barry could have put to use." Trial Court Decision and Entry, p. 3. This is an assumption that is not established by the facts, and is not part of the court's duties in evaluating a motion to dismiss. The trial court further stated that:

> In paragraph 33 of the Amended Complaint Sacksteder states that during his talks with Barry he gave him confidential information. Barry with his attorney terminated

their negotiations and shortly thereafter a sale was made to Belcan. No loss due to the failure of negotiations is claimed; none can be since no numbers are given as to either Barry's offer nor as to Belcan's final price for the business. Again, the court is invited simply to speculate, if those are the damages plaintiff is speaking of. Id.

{¶ 55} We conclude that the trial court's decision requires a degree of specificity that is unwarranted in filing a complaint. Furthermore, the arguments by the law firm defendants miss the point. For example, the law firm defendants argue that they were not involved directly in Sacksteder's decision to discuss confidential information with Barry. However, the crux of the alleged malpractice is that the defendants failed either to advise Sacksteder not to disclose information, or to protect him in the event that he chose to do so. This would be particularly important in the context of dual representation by the law firm.

{¶ 56} The law firm defendants also heavily rely on the contention that plaintiffs cannot show the proximate cause of the alleged damages, because plaintiffs cannot prove that the damages are collectable, as required by law. In this regard, defendants focus on the fact that Barry "made the final decision not to purchase EXTRAhelp, *likely* based on EXTRAhelp's financial condition or other factors which would have influenced Barry regardless of the PSE Appellees' involvement in those discussions." Brief of Law Firm Appellees, p. 20. (Emphasis added.) The law firm defendants also focus on the fact that EXTRAhelp's business was sold to another party days later.

{¶ 57} The Supreme Court of Ohio has held that "collectibility is logically and inextricably linked to the legal-malpractice plaintiff's damages, for which the plaintiff bears the burden of proof. In proving what was lost, the plaintiff must show what would have been

gained." *Paterek v. Petersen & Ibold*, 118 Ohio St.3d 503, 2008-Ohio-2790, 890 N.E.2d 316, ¶ 37. However, this is not a matter of proof at the pleading stage; it is a matter for trial or, perhaps, for summary judgment if the facts are undisputed. For example, in *Paterek*, the case did not come before the court following motions to dismiss the legal malpractice case – the matter proceeded to trial and a jury verdict. Id. at ¶ 16.

{¶ 58} In this regard, we are also troubled by the speculation that is shown through comments about what another party was "likely" thinking when making decisions. This kind of remark (many of which are found in all defendants' briefs), exemplifies the danger of dismissing cases on the pleadings through weighing of evidence, as the defendants argue that *Twombly* and *Iqbal* appear to allow.

{¶ 59} The law firm defendants also contend that EXTRAhelp lacks standing to bring this case, because its business was sold to Belcan shortly after the sale to BarryStaff fell through. The law firm contends that EXTRAhelp was required to allege specifics with respect to the sale, or as the trial court phrased it, to provide "numbers." We disagree.

{¶ 60} "Standing is a threshold question for the court to decide in order for it to proceed to adjudicate the action." *State ex rel. Jones v. Suster*, 84 Ohio St.3d 70, 77, 1998-Ohio-275, 701 N.E.2d 1002. However, the issue of lack of standing "challenges the capacity of a party to bring an action, not the subject matter jurisdiction of the court." Id. To decide whether the requirement has been satisfied that an action be brought by the real party in interest, "courts must look to the substantive law creating the right being sued upon to see if the action has been instituted by the party possessing the substantive right to relief." *Shealy v. Campbell*, 20 Ohio St.3d 23, 25, 485 N.E.2d 701 (1985).

{¶ 61} Although standing is a threshold matter, the decision is often made at the earliest at the summary judgment stage. See, *e.g.*, *Shealy* at 24 (standing issue decided upon trial of case); *Fifth Third Mtge. Co. v. Bihn*, 2d Dist. Montgomery No. 24691, 2012-Ohio-637, ¶ 15 (standing issue implied in trial court and specifically raised on appeal after summary judgment had been granted to mortgagee); *Dibert v. Carpenter*, 196 Ohio App.3d 1, 2011-Ohio-5691, 961 N.E.2d 1217, ¶ 21-22 (2d Dist.) (standing issue raised via motion for partial summary judgment); and *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 194 Ohio App.3d 644, 2011-Ohio-2681, 957 N.E.2d 790, ¶ 19 (2d Dist.)(standing issue raised in summary judgment motion).

{¶ 62} This is not to say that standing cannot be raised in motions to dismiss. However, "[a]t the pleading stage, a party establishes standing by alleging enough general facts to show that injury resulted from the defendant's conduct, because when deciding a motion to dismiss, a court will presume 'that general allegations embrace those specific facts that are necessary to support a claim.' " (Citation omitted). *S. Christian Leadership Conference v. Combined Health Dist*., 191 Ohio App.3d 405, 2010-Ohio-6550, 946 N.E.2d 282, ¶ 17 (2d Dist.).

{¶ 63} In view of the preceding discussion, we conclude that Sacksteder and EXTRAhelp have alleged sufficient facts to withstand a motion to dismiss on the issue of standing. As we mentioned, the complaints indicate that if the law firm defendants had properly represented Sacksteder and EXTRAhelp, they (Sacksteder and EXTRAhelp) would have enjoyed a better financial position than the financial position in which they find themselves. The complaints also state that Sacksteder and EXTRAhelp have each suffered monetary damages.

{¶ 64} While there is no specific allegation that the eventual sale price was less, the inference is present. In addition, Sacksteder and EXTRAhelp indicated to the trial court, and the

court did consider, the allegation that the sale to Belcan provided for revenue based on future sales to customers of EXTRAhelp that were retained.   If the sale price were to be paid over time, or were dependent, in part, on future business from EXTRAhelp's former customers (see ¶ 10, supra), the attorneys' failure to get a signed confidentially agreement could have led to Barry's taking some of EXTRAhelp's customers (see ¶ 11, supra).   This would cause monetary damages to the plaintiffs.

{¶ 65}   While the claim as to damages may have been better phrased, plaintiffs are not required to try their case in the initial pleadings.   The original complaint was 45 pages long, and the amended complaint consisted of 38 pages.   Both documents could have been written more artfully, but the degree of detail demanded by defendants would require litigants to write a book when filing legal actions.

{¶ 66}   In fact, courts have previously commented on complaints that are unnecessarily lengthy and detailed.   For example, in *Scaccia v. Lemmie*, 2d Dist. Montgomery No. 21506, 2007-Ohio-1055, we affirmed the dismissal of a case in which the plaintiff had filed a 70-page complaint that contained 548 paragraphs and nineteen separate causes of action, and an amended complaint that contained 50 pages, 440 paragraphs, and eighteen causes of action.   Id. at ¶ 5 and 8.   The plaintiff in *Scaccia* argued that the complaint was as concise as it could be, given the nature of the action, and that the trial court had erred by striking the entire complaint, rather than excising the improper parts.   Id. at ¶ 19.

{¶ 67}   In reviewing the matter, we noted that " 'Civ.R. 8(A) does not contemplate evidentiary pleading.' " Id. at ¶ 20, quoting *Collins v. National City Bank*, 2d Dist. Montgomery No. 19884, 2003-Ohio-6893, ¶ 58.   We further observed that:

We have reviewed the first complaint, and agree with the trial court that it failed to set forth a short and plain statement showing that Scaccia was entitled to relief. For example, at one point in the complaint, Scaccia devotes five paragraphs to describing his qualifications for employment rather than merely averring that he was qualified for the position he sought. In another portion of the complaint, Scaccia devotes approximately twenty paragraphs to describing the birth of his child and the City's failure to provide him with appropriate leave rather than merely stating that the City acted inappropriately by denying the leave. These are merely two examples of page after page of tedious detail of numerous events that could, and should, have been distilled into a more concise statement. Id. at ¶ 21.

{¶ 68} Litigants should not have to navigate between the Scylla of saying too little and the Charybdis of saying too much, never knowing what level of detail will cause their complaints to be dismissed.

{¶ 69} As a final matter, the law firm defendants contend that Sacksteder's claims should be dismissed because he does not allege that he had an individual attorney-client relationship with the firm. We disagree. The complaints allege that Andrew Storar and other lawyers at PS&E provided various legal services to Sacksteder and EXTRAhelp on an "as-needed, when-needed" basis. The complaints further allege that Sacksteder was told that attorney Paul Zimmer would be representing Sacksteder and EXTRAhelp with regard to the transaction in question. We fail to see what more would be required to allege an attorney-client relationship.

{¶ 70} Applying standard Civ. R. 12(B)(6) analysis, we conclude that the complaints

state a claim for relief against the law firm defendants. Even applying a "plausibility" test, it is certainly "plausible" that an attorney's failure to properly advise a client regarding confidentiality, or to protect the client by providing confidentiality agreements, could cause damage to the sale of a client's business. EXTRAhelp alleged that the law firm's failures caused it to be in a poorer financial condition, and this is sufficient. EXTRAhelp was not required to detail its damages, or to provide "numbers," as the trial court suggested. This was not a trial to the bench or a motion for summary judgment – it was simply a motion to determine if the case could proceed to discovery. Accordingly, the trial court erred in dismissing the First, Second, and Third Claims for Relief, which were brought against the law firm defendants. We express no opinion on the merits or even probability of success of these claims.

B. Claims against the Prospective Purchaser

{¶ 71} The claims against BarryStaff, the prospective purchaser, and its president, Douglas Barry, Jr., are contained in the Fourth, Seventh, and Ninth Claims for Relief. These claims for relief allege, respectively, that the Barry defendants participated in the breaches of fiduciary duty by the law firm defendants; that the Barry defendants participated in the breaches of fiduciary duty by the employees of EXTRAhelp; and that the Barry defendants tortiously interfered with the existing business and contractual relationships that Sacksteder and EXTRAhelp had with customers and clients of EXTRAhelp.

{¶ 72} "To maintain a claim of breach of a fiduciary duty, the plaintiff must prove (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Harwood v. Pappas & Assoc., Inc.*, 8th Dist. Cuyahoga No. 84761, 2005-Ohio-2442, ¶ 26, citing *Strock v. Pressnell*, 38 Ohio St.3d 207, 216,

527 N.E.2d 1235 (1988).

{¶ 73} The relationship between the plaintiffs and the law firm defendants was a fiduciary relationship, but the allegation against the Barry defendants is based on their participation in another's breach of fiduciary duty. This theory was rejected by the trial court, based on the fact that Ohio courts have not recognized a cause of action for participation in a breach of fiduciary duty. Sacksteder and EXTRAhelp contend that Ohio has recognized this tort.

{¶ 74} After briefs were filed, the Supreme Court of Ohio issued a decision answering a certified question regarding whether Ohio recognizes a cause of action for liability under 4 Restatement of the Law 2d, Torts, Section 876 (1979). This section provides for imposition of liability for the conduct of others, if the defendant:

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person. Id. at 315.

{¶ 75} The Supreme Court of Ohio answered the question in the negative, stating that : "This court has never recognized a claim under 4 Restatement 2d of Torts, Section 876 (1979), and we decline to do so under the circumstances of this case." *DeVries Dairy, L.L.C. v. White Eagle Coop. Assn., Inc.*, ___ Ohio St.3d ___, 2012-Ohio-3828, ___ N.E.2d ___, ¶ 2.

{¶ 76} In view of this recent decision of the Supreme Court of Ohio, we conclude that the trial court did not err in dismissing the Fourth and Seventh Claims for Relief against Barry and BarryStaff. Whether the fiduciary claim is against the law firm defendants or the employees of EXTRAhelp, persons "participating" in the direct actor's breach of fiduciary duty are not liable.

{¶ 77} The other claim against the Barry defendants is based on contractual and business interference. The trial court rejected these claims, based on lack of standing, lack of specifics regarding cancellations causing loss to plaintiffs, and lack of allegations that "any contracts of any kind are alleged to have gone out of the Belcan-EXTRAhelp orbit." Trial Court Decision and Entry, p. 6.

{¶ 78} "The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." *Fred Siegel Co., LPA v. Arter & Hadden*, 85 Ohio St.3d 171, 707 N.E.2d 853 (1999), paragraph one of the syllabus. Similarly, "The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." (Citations omitted.) *Wolf v. McCullough–Hyde Memorial Hosp.*, 67 Ohio App.3d 349, 355, 586 N.E.2d 1204 (12th Dist.1990). "The main distinction between tortious interference with a contractual relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet

reduced to a contract." (Citation omitted.) *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co.*, 148 Ohio App.3d 596, 2002-Ohio-3932, 774 N.E.2d 775, ¶ 23 (3d Dist.).

{¶ 79} We have already discussed the standing issue, and reject that argument. We also conclude, contrary to the trial court, that EXTRAhelp adequately stated a claim for business interference and/or contractual interference. The complaints alleged that Barry and BarryStaff wrongly solicited EXTRAhelp's largest customer, using confidential trade secrets or confidential information, and wrongly caused that customer to leave EXTRAHelp. Furthermore, although not explicitly pled in the complaint, the trial court was aware of EXTRAhelp's contention that it was entitled to a share of further earnings from customers that were retained by Belcan after the sale. The trial court rejected this argument, stating that because EXTRAHelp chose not to attach this contract to the complaint, that there was no such contract. At most, such document could have been provided, if it exists, in response to an appropriate motion by the Barry defendants.

{¶ 80} Again, the case was not before the trial court on a summary judgment or bench trial. EXTRAhelp and Sacksteder were not required to try their case on the pleadings. They were also not required to attach a copy of the sale contract to the pleading. Although Civ. R. 10(D) provides that "[w]hen any claim or defense is founded on an account or other written instrument, a copy of the account or written instrument must be attached to the pleading," the claim against the Barry defendants was not founded on an account or written document. The requirement of attaching documents typically applies to matters like accounts, leases, and the like. For example, "The purpose of the requirement to attach an account imposed by Civ.R. 10(D) is to exemplify the basis of the particular claim for relief alleged, in order to confine the issues in the action to matters related to the course of dealings between the parties the attachment

portrays." *Asset Acquisitions Group, L.L.C. v. Gettis*, 186 Ohio App.3d 586, 2010-Ohio-950, 929 N.E.2d 506, ¶ 14 (2d Dist.). This is because the contract is the "best evidence" of the transaction. Id.

{¶ 81} The case before us does not involve a "contract" between the plaintiffs and the Barry defendants. The existence of a contract between Belcan and EXTRAhelp, allowing for payment to EXTRAhelp based on retained customers, is evidentiary matter that would be used at trial to prove damages. It need not be attached to the complaint in order for the complaint to survive a motion to dismiss. If courts were to require this type of attachment to pleadings, there could be no end to what plaintiffs would be required to file, simply to be allowed to proceed beyond the initial pleading. It would also unduly burden courts, which are already plagued by a sea of documents.

{¶ 82} As final matter, we note that Sacksteder conceded in the trial court that he has no individual claim against Barry under the Ninth Claim for Relief.

{¶ 83} For the reasons stated, the trial court did not err in dismissing the Fourth and Seventh Claims for Relief, but did err in dismissing the Ninth Claim for Relief with respect to the Barry defendants, but only insofar as the dismissal of EXTRAhelp's claims is concerned. The dismissal with regard to Sacksteder's claims was not error.

Claims against the EXTRAhelp Employees

{¶ 84} In the Fifth, Sixth, and Eighth Claims for Relief, Sacksteder and EXTRAhelp contend that Buening, Ambos, and Brumbaugh improperly misappropriated, converted, and disseminated trade secrets and confidential and proprietary business information. The trial court dismissed these claims, because EXTRAhelp never provided facts to bring the information

within the "statutory definition of trade secret." Trial Court Decision and Entry, p. 5. The court also focused on the fact that Sacksteder, himself, disclosed "some" of his secret information to Barry, and that the employees did not sign non-disclosure agreements.

{¶ 85} As an initial matter, we note that Sacksteder conceded in the trial court that he has no individual claim against the employees. Therefore, the sufficiency of the complaint will be considered only as to EXTRAhelp's claims.

{¶ 86} In the Fifth Claim for Relief, EXTRAhelp contends that Buening, Ambos, and Brumbaugh were employed in managerial positions of trust, gained access to confidential information in that capacity, and breached fiduciary duties by disclosing this information to Barry. As was noted, Sacksteder also alleged in the complaints that Barry used this confidential information to solicit EXTRAhelp's largest client.

{¶ 87} In order to prove a breach of fiduciary duty claim, the plaintiff must establish (1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom. "A 'fiduciary' has been defined as a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." In some instances, an employee can be a fiduciary of an employer; however, employees typically owe nothing more than a duty of good faith and loyalty to their employer.

Generally, the determination of what constitutes a fiduciary relationship is a question of fact dependent on the circumstances of each case. (Citation omitted). *Gracetech Inc. v. Perez*, 8th Dist. Cuyahoga No. 96913,

2012-Ohio-700, ¶ 11-12.

**{¶ 88}** In our view, the complaints adequately allege the existence of fiduciary relationships between these employees and their employer. The complaints allege that they were in managerial positions, were in positions of trust, and were entrusted with confidential and proprietary business information. We are unsure, factually, what more the complaints would have needed to say, unless it was to list the exact confidential and proprietary information. Whether such a relationship actually existed and what the information was are questions of fact not resolvable through a motion to dismiss.

**{¶ 89}** In this regard, the employee defendants point out that ordinary employees typically owe their employee nothing more than a duty to act in the utmost good faith. While this is true, reference to the case cited for this proposition illustrates why dismissal at the pleading stage is not appropriate. In *Lombardo v. Mahoney*, 8th Dist. Cuyahoga No. 92608, 2009-Ohio-5826, an employer had sued its employee, claiming breach of fiduciary duty. The trial court denied a motion for judgment on the pleadings, and then later granted summary judgment after the employee submitted evidence indicating that she merely performed clerical functions like answering telephones and taking messages. She also offered proof that she had not taken the improper actions alleged, and the employer offered no evidence of any kind in response. Id. at ¶ 17 and 20. Under the circumstances, the employee was clearly not acting in a fiduciary capacity, and the claims against her were not substantiated. But, the claims were dismissed after the employer had been given an opportunity to present factual issues regarding its case.

**{¶ 90}** This discussion illustrates the problems with the position advocated by all

defendants, which appears to urge trial on the pleadings, governed by judges who weigh facts. For example, the employee defendants point out that Sacksteder, himself, disclosed trade secrets or confidential information to Barry during their discussion. They, contend, therefore, that they could not be liable for disclosing trade secrets, because Sacksteder disclosed the "same" information. See, Ambos and Brumbaugh Brief, p. 18, and Buening Brief, p. 17.

{¶ 91} The complaints did not say that Sacksteder disclosed the "same" information that the defendants allegedly disclosed. Instead the complaints stated that Sacksteder did disclose some confidential information to Barry, and that the defendants also disclosed confidential and proprietary information and trade secrets. Whether this involves the "same" information or not is a matter to be established at the summary judgment stage or at trial.

{¶ 92} The complaints do not specifically indicate whether Ambos and Brumbaugh knew of the sale until after it occurred. However, the complaints do indicate that these individuals, as well as Buening, disclosed confidential information, that Barry improperly used this confidential information to solicit EXTRAhelp's customers, and that EXTRAhelp was damaged as a result. See Amended Complaint, ¶ 105-107. As was noted, if EXTRAhelp were due to receive revenue from clients that Belcan retained, EXTRAhelp would have standing to sue. Accordingly, we conclude that EXTRAhelp provided sufficient information to withstand a motion to dismiss the Fifth Claim for Relief.

{¶ 93} The Sixth and Eighth Claims for Relief alleged that the employee defendants misappropriated and converted trade secrets and confidential and proprietary business information for their own uses. Again, the employee defendants contend that the information is insufficient to withstand a motion to dismiss, because Sacksteder disclosed the "same"

information. They also argue that the complaints are deficient because they fail to comply with certain standards adopted in the area of trade secrets.

{¶ 94} This argument again illuminates why dismissal on the pleadings is premature. In this regard, the employee defendants rely on a six-factor test that the Supreme Court of Ohio adopted for determining whether items meet the statutory definition of trade secrets contained in R.C. 1331.61(D). See *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 524-525, 687 N.E.2d 661 (1997).

{¶ 95} R.C. 1331.61(D) defines a trade secret as:

[I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

{¶ 96} In *The Plain Dealer*, the Supreme Court adopted and applied the following six-factor test for deciding if trade secret claims meet the statutory definition:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the

precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. 80 Ohio St.3d at 524-525.

**{¶ 97}** . In the case before us, the employee defendants contend that the complaints are insufficient because they fail to contain factual allegations pertaining to each of these criteria. Again, we disagree. If complaints were required to set out factual criteria that meet various "tests" adopted by courts to review evidence, Ohio would return to cumbersome pleading requirements that were discarded many years ago. The number of such lists of factors or "tests" could be virtually endless. In this regard, we note that unlike the present case, *The Plain Dealer* involved a petition for writ of mandamus and an evidentiary review, including an in camera inspection of documents claimed to be trade secrets. Id. at 517. Thus, the court had an opportunity to decide the matter on the merits, not the pleadings.

**{¶ 98}** For the reasons stated, the Sixth and Eighth Claims for Relief are sufficient to withstand a motion to dismiss, and the trial court erred in dismissing these claims. As before, we state no opinion on the merits of the claims.

**{¶ 99}** The only matter remaining is the Ninth Claim for Relief, which raises claims of contractual and business interference. The trial court dismissed this claim against the employee defendants, because the complaint failed to demand judgment against the employee defendants. EXTRAhelp does not address this point in its brief, but simply points out that the claim for relief states a claim against Barry, BarryStaff, and the employee defendants.

{¶ 100}    The trial court was correct in concluding that EXTRAhelp did not ask for judgment against the employee defendants on this particular claim, but neither the trial court nor the parties offered legal analysis or citations to support dismissal on this ground.

{¶ 101}    Civ. R. 54(C) states that "[e]xcept as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded the relief in the pleadings."   Thus, for example, a plaintiff has been allowed to recover damages or other forms of recovery that either exceed the amount requested in the complaint, or were not requested at all.  See, *e.g.*, *Arnold v. Fitworks, LLC.*, 8th Dist. Cuyahoga No. 84737, 2004-Ohio-7031, ¶ 12-13, and *State ex rel. Rothal v. Smith*, 151 Ohio App.3d 289, 307, 2002-Ohio-7328, 783 N.E.2d 1001, ¶ 80-82 (9th Dist.) (noting that under Civ. R. 54(C), "the trial court may render whatever judgment is equitable considering the issues raised in the pleadings or at trial.") Consequently, failure to specifically request judgment against the employee defendants was not a proper basis for dismissing the Ninth Claim of Relief.

{¶ 102}    We have already concluded that the complaints adequately state a claim for business and/or contractual interference against the Barry defendants, and the same reasoning would apply here.   The employee defendants contend in their briefs that EXTRAhelp failed to allege numerous facts, including the names of customers who were solicited, the nature of the customers' relationships with EXTRAhelp, or facts regarding the defendants' knowledge of these customers.   In addition, the defendants maintain that EXTRAhelp should have attached its contracts with customers to the complaint.

{¶ 103}    As noted, EXTRAhelp did allege sufficient facts to support a business

interference claim. And, contrary to the employee defendants' assertions, EXTRAhelp did allege that its largest customer was lost to due to interference. Accordingly, the Ninth Claim states a claim for relief against the employee defendants.

## IV. Conclusion

{¶ 104} The judgment of the trial court will be affirmed in part and reversed in part. The dismissal of Sacksteder's and EXTRAhelp's First, Second, and Third Claims for Relief is reversed; the dismissal of the Fourth and Seventh Claims for Relief is affirmed; the dismissal of the Sixth and Eighth Claims for Relief is affirmed, with respect to the claims of Sacksteder, but reversed as to the claims of EXTRAhelp; the dismissal of the Ninth Claim for Relief is affirmed with respect to the claims of Sacksteder, and, is reversed with respect to the claims of EXTRAhelp against Barry, BarryStaff, Buening, Ambos, and Brumbaugh. This case will be remanded for further proceedings.

. . . . . . . . . .

FAIN, J., concurring:

{¶ 105} I concur in Judge Froelich's opinion for the court. I write separately merely to clarify my view of the rules of pleading.

{¶ 106} The requirements for pleading a cause of action in an Ohio court are set forth in Civ.R. 8. The Supreme Court of Ohio is the ultimate authority on the proper construction of Ohio law, not the Supreme Court of the United States.[1] Therefore, the decisions of the Supreme Court of the United States in the *Bell Atlantic Corp. v. Twombly* and *Ashcroft v.*

---

[1] Of course, if federal law conflicts with Ohio law, federal law prevails by virtue of the Supremacy Clause in Article VI of the United States Constitution. In the case before us, there is no conflict; federal rules of pleading govern the pleading of causes of action in federal court, and Ohio rules of pleading govern the pleading of causes of action in Ohio courts.

*Iqbal* cases, cited in Judge Froelich's opinion, cannot override the rules of pleading established by the Ohio Rules of Civil Procedure, as interpreted by the Supreme Court of Ohio. The *Twombly* line of cases has no application to the rules of pleading in Ohio courts unless and until the Supreme Court of Ohio incorporates the principles set forth in those cases in its interpretation of the Ohio rules of pleading.

· · · · · · · · · ·

HALL, J., concurs with Judge Froelich's opinion and with Judge Fain's concurring opinion.

· · · · · · · · · ·

Copies mailed to:

John J. Mueller
Neil F. Freund
Lindsay M. Johnson
John F. Haviland
Carla J. Morman
Quintin F. Lindsmith
Victoria A. Flinn
Hon. Michael L. Tucker